IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Newport News Division

UNITED STATES OF AMERICA,

      v.                                                              Criminal No. 4:20cr15 (DJN)

DAWHAN TERRELL ARCHIBLE,
        Defendant.

**MEMORANDUM OPINION**

On March 19, 2021, after considering all of the evidence presented during trial, a jury found Defendant Dawhan Terrell Archible ("Archible" or "Defendant") guilty on five counts related to Defendant's participation in a drug distribution conspiracy and the shooting death of Luke Dudley ("Dudley"). Defendant now asks the Court to overturn the verdict that the jury reached after considering all of the evidence presented during trial or, alternatively, vacate the judgment and grant a new trial. This matter comes before the Court on Defendant's Motion for Judgment of Acquittal and/or a New Trial ("Def.'s Mot." (ECF No. 134)). For the reasons set forth below, the Court hereby DENIES Defendant's Motion.

### I.    BACKGROUND

**A.**    **Indictment and Trial**

On October 23, 2020, the Government filed an amended indictment (the "Indictment" (ECF No. 64)), charging Defendant with five offenses, including: Use of a Firearm Resulting in Death, in violation of 18 U.S.C. §§ 924(c)(1) and (j) and (2) (Count One); Conspiracy to Interfere with Commerce by Robbery, in violation of 18 U.S.C. § 1951(a) (Count Two); Attempt to Interfere with Commerce by Robbery, in violation of 18 U.S.C. §§ 1951(a) and (2) (Count

Three); Drug Conspiracy, in violation of 21 U.S.C. § 846 (Count Four); and, Distribution of Cocaine Base, in violation of 21 U.S.C. § 841(a)(1) and (b) (Count Five).

The Court conducted a jury trial beginning on March 15, 2021. During trial, the jury heard testimony from seventeen witnesses. Officer Allison Sprinkle ("Officer Sprinkle"), a detective with the Newport News Police Department, testified that on the afternoon of January 15, 2017, she was dispatched to a four-bedroom rooming house located at 3005 Madison Avenue in Newport News, Virginia, to respond to a 911 call made by Ashlai Luellen, a resident of the rooming house. (Tr. at 96:13; 100:1-20.) At the time, Officer Sprinkle believed that she was responding to a past burglary. (Tr. at 104:13-14.) Upon arrival at the home, Officer Sprinkle observed that someone had broken into the front door and that pieces of the doorframe were laying on the front porch. (Tr. at 103:12-22; Gov't Ex. 10; Gov't Ex. 11.)

Officer Sprinkle and Luellen entered the home to survey the damage. (Tr. at 104:16-23.) Upon ascending to the second floor of the building where three of the home's four bedrooms were located, Officer Sprinkle noticed that the door to one of the bedrooms — identified as Apartment D — appeared to have been kicked in or forced open in some manner. (Tr. at 106:15-25.) Officer Sprinkle stepped into the room and observed a deceased white male laying in a small nook in the corner of the room. (Tr. at 107:3-22.) Officer Sprinkle also saw two cartridge casings at the ground near the individual's feet. (Tr. at 107:25; 108:1-5.) Luellen identified the deceased as her downstairs neighbor, Luke Dudley. (Tr. at 108: 14-18.)

Based on blood smears found at the scene and information provided to police by George Holley, a paid police informant and resident of Newport News, Virginia, at the time of Dudley's murder, authorities identified Defendant Dawhan Archible as a potential suspect in Dudley's killing. (Tr. at 172-181; 506-07.) Anthony Ambrose ("Agent Ambrose"), a Special Agent with

ATF, interviewed Defendant on October 19, 2017, regarding his involvement in Dudley's murder. (Gov't Ex. 131.) Defendant explained to Ambrose that he was a "five-star" member of the Bloods gang. (Tr. at 515:5-22; Gov't Ex. 131 at 6-8.) Defendant confirmed that in this rank he could order other subordinate gang members to complete his dirty work, including having somebody killed. (Tr. at 521:17-25; Gov't Ex. 131 at 20.) He stated that one of his closest friends, Keandre Ricks ("Dre" or "Ricks") was a "three-star" (and therefore ranked lower than Defendant). (Tr. at 516:11-12; Gov't Ex. 131 at 11.) Defendant stated of Ricks: "Whatever I tell Dre to do, Dre will do. . . 'Go to such-and-such- go to such-and-such. Bro owe me some money. If he don't give you your money, just do whatever you want to do. That's up to you, but I need my money.'" (Gov't Ex. 131 at 40.) When Agent Ambrose asked Defendant whether Defendant had ever called an order to get someone killed, Defendant responded in the affirmative, and proceeded to give Agent Ambrose an account of what occurred on January 15, 2017. (Tr. at 521-22.)

Defendant confirmed that he went to Dudley's house on the morning of January 15 with two other individuals — Ricks and Delvon Nicholson ("Von" or "Nicholson") — after Dudley gave Defendant fake Percocets in exchange for crack cocaine earlier that same morning. (Gov't Ex. 131 at 20-21.) When Defendant discovered that Dudley had sold him bad drugs, he stated "ain' nobody about to play me like this bro. I'm about to get my shit back," and then told Ricks to grab a gun before the three men walked to Dudley's house. (Gov't Ex. 131 at 28-30.)

When Defendant, Ricks and Nicholson arrived at 3005 Madison Avenue, Dudley did not answer, so Defendant broke into the home. (Gov't Ex. 131 at 31.) They found Dudley in his room on the first floor of the rooming house, already high on the crack cocaine that Defendant had traded to him. (Gov't Ex. 131 at 32.) Ricks then began beating Dudley with the gun.

(Gov't Ex. 131 at 32-33.) Defendant then ordered Ricks to search Dudley's room and the rest of the house for either the drugs or money that Dudley owed to Defendant. (Gov't Ex. 131 at 33, 39.) Defendant also commanded Ricks to hand him the gun while Ricks searched, and Defendant had the weapon drawn on Dudley during the search. (Gov't Ex. 131 at 33.)

Ricks failed to find any drugs in his search. By this point, Ricks and Defendant had dragged Dudley upstairs to Apartment D. (Gov't Ex. 131 at 37.) Defendant stated during his interview with Agent Ambrose of what followed: "I gave Dre the gun. I looked at him, and I turned away. Luke was standin' in the back of the room. Filled Luke ass up. Pop, pop, pop, pop, pop, pop, pop." (Gov't Ex. 131 at 33.)

George Holley also testified. Holley had contacted the Newport News Police Department in the days following Dudley's murder with information that implicated Defendant in the crime. (Tr. at 354:8-12.) Holley knew Defendant from the neighborhood, as both individuals spent time at 714 36th Street, Newport News, Virginia, a known "trap house" in the Marshall Courts neighborhood of Newport News. (Tr. at 357:9-18.) Marquis Jones ("Jones" or "Snooks") and Ricks also spent time there. (Tr. at 358:12-15, 359:1-14.)

Holley testified that on January 15, 2017, he encountered Defendant as Holley was leaving an H&H convenience store and heading towards 714 36th Street. (Tr. at 369:20-22.) Defendant proceeded to bring Holley's attention to the police cars gathering in the 30th and 31st blocks of Madison Avenue. (Tr. at 370:5-11.) Defendant told Holley "that was his work" and that Holley should "go down there and check things out." (Tr. at 370:13-14.)

Later, after Holley arrived at 714 36th Street, he overheard a conversation between Defendant and Snooks, wherein Defendant recounted what had happened at 3005 Madison

Avenue. (Tr. at 377:2-25.) Holley testified that Defendant "said out of his mouth that he pulled the gun out, shot that man [Dudley] so many times and then Dre shot him so many times." (Tr. at 380:17-21.)

Defendant also testified at trial. He recounted a version of events similar to that in his original statement to police in October 2017. He acknowledged that he intended to inflict some physical harm on Dudley when he went to Dudley's home if Dudley could not produce the drugs. However, Defendant denied ever intending to shoot Dudley. (Tr. at 644:1-6.)

On March 18, 2021, the Court charged the jury with its instructions, and the parties made their closing arguments. The next day, on March 19, 2021, the jury found Defendant guilty on all five counts.

### B. Defendant's Motion

On June 8, 2021, Defendant filed the instant Motion. Defendant seeks to set aside the jury's verdict as to Count One only, and does not attempt to contest the jury's findings as to the other counts. Defendant posits two primary arguments in support of his Motion. First, he contends that Dudley's killing did not occur "in the course" of the commission of Count Four, because the goal of the drug conspiracy to distribute crack cocaine had already been completed. (Def.'s Mot. at 11.) Alternatively, Defendant argues that he did not shoot Dudley. (Def.'s Mot. at 12.) Defendant urges the Court to find that the testimony of informant Holley that Archible shot Dudley lacks credibility, and to instead credit Defendant's statements during three separate interviews with police and during trial that he did not shoot Dudley. (Def.'s Mot. at 12.)

On June 22, 2021, the Government filed its Response in Opposition to Defendant's Motion for Judgment of Acquittal and/or New Trial ("Gov't Resp." (ECF No. 135).) On June 28, 2021, Defendant filed his Reply to Government's Response to Motion to Set Aside. ("Def.'s

Reply" (ECF No. 136).) Although Defendant initially appeared to concede in his opening position that the evidence shows that he "knew or should have known that Ricks was violent and dangerous" and, therefore, that "the jury could infer . . . that even if it is not proven that Archible shot Dudley, the jury may find him guilty of murder under an aiding and abetting theory" (Def.'s Mot. at 14), in his Reply, Defendant challenges the Government's aiding and abetting theory of liability. Specifically, he challenges whether the Government presented sufficient evidence that Defendant had the requisite intent — i.e., malice aforethought — to be guilty of Dudley's murder. (Def.'s Reply at 2-3.) This matter is now ripe for review.

## II. STANDARD OF REVIEW

Pursuant to Federal Rule of Criminal Procedure 29(c)(1), "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Upon such motion, "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(2). In deciding whether to set aside a guilty verdict, the Court must consider "whether there is substantial evidence (direct or circumstantial) which, taken in the light most favorable to the prosecution, would warrant a jury finding that the defendant was guilty beyond a reasonable doubt." *United States v. MacCloskey*, 682 F.2d 468, 473 (4th Cir. 1982). Accordingly, "[a] guilty verdict should be upheld if it is supported by substantial and competent evidence." *United States v. Whyte*, 2018 WL 521593, at *3 (W.D. Va. Jan. 23, 2018) (citing *Glasser v. United States*, 315 U.S. 60, 80 (1942)).

In deciding whether substantial and competent evidence exists, the Court should not decide whether the evidence convinces it beyond a reasonable doubt of the defendant's guilt, only whether evidence exists "that a reasonable finder of fact could accept as adequate and

sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Alerre*, 430 F.3d 681, 693 (4th Cir. 2005). Importantly, the Court may not weigh the evidence, draw inferences from the facts, resolve evidentiary conflicts or assess the credibility of witnesses, for such functions fall within the province of the jury. *United States v. Arrington*, 719 F.2d 701, 704 (4th Cir. 1983). "Further, 'if the evidence supports different, reasonable interpretations, the jury decides the interpretation to believe.'" *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997) (quoting *United States v. Murphy*, 35 F.3d 143, 148 (4th Cir. 1994)). Deference to the jury requires the Court to "construe the evidence in the light most favorable to the Government, assuming its credibility, drawing all favorable inferences from it, and taking into account all the evidence, however adduced." *United States v. Johnson*, 55 F.3d 976, 979 (4th Cir. 1995). Ultimately, a defendant challenging the sufficiency of the evidence supporting his conviction "must overcome a heavy burden." *United States v. Hoyte*, 51 F.3d 1239, 1245 (4th Cir. 1995).

Pursuant to Federal Rule of Criminal Procedure 33(a), "the court may vacate any judgment and grant a new trial if the interest of justice so requires." In determining whether new evidence warrants a new trial, the Court considers five factors:

> (a) the evidence must be, in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*United States v. Robinson*, 627 F.3d 941, 948 (4th Cir. 2010) (internal quotations omitted). Otherwise, the "interest of justice" standard requires that some grounds exist that cause "the fundamental fairness or integrity of the trial result [to be] substantially in doubt." *United States v. Jennings*, 438 F. Supp. 2d 637, 642 (E.D. Va. 2006). Additionally, "there is also a strong

7

interest in ensuring that convictions are not allowed to stand if infected by, or based on, an incorrect application of the governing law." *Id.*

### III. ANALYSIS

The Court will address in turn each of the two grounds for acquittal and/or a new trial that Defendant advances in his Motion.

### A. Dudley's Murder Was "In The Course Of" The Commission of Count Four.

Defendant contends that he and Ricks had accomplished the goal of the drug conspiracy — i.e., the distribution of cocaine to Dudley — before the murder, so Dudley's murder did not occur "in the course of" the conspiracy. (Def.'s Mot. at 3-12.) Specifically, Defendant argues that the "the overt act accomplished by this narrow conspiracy was the distribution of crack cocaine to Dudley. Whatever form of payment, whether money or Percocet, Archible intended to receive from Dudley is not a part of the conspiracy and not a goal of it." (Def.'s Mot. at 4.) The Court finds this argument unpersuasive.

The elements of a drug conspiracy under 21 U.S.C. § 846 include: (1) an agreement between two or more persons to violate a federal drug law; (2) knowledge by the defendant of the conspiracy; and, (3) knowing and voluntary participation by the defendant in the conspiracy. *United States v. Hickman*, 626 F.3d 756, 763 (4th Cir. 2010). If a defendant uses or carries a firearm in relation to a violation of this section, he shall also be guilty of a violation of 18 U.S.C. § 924(c), which criminalizes the use and carrying of a firearm during a drug trafficking crime. Furthermore, if, in the course of a violation of § 924(c), a person "causes the death of a person through the use of a firearm," that person violates 18 U.S.C. § 924(j). Thus, a conspiracy to commit a drug trafficking crime acts as a predicate offense for a violation of § 924(j).

8

The Fourth Circuit has held that the act of collecting unpaid drug money to fulfill a drug debt constitutes an act in furtherance of a conspiracy to distribute drugs and, therefore, supports a violation of 18 U.S.C. § 924(c). *United States v. Locklear*, 24 F.3d 641, 647 (4th Cir. 1994) ("We have little trouble concluding that, even assuming collection of drug monies does not constitute part of 'drug distribution,' it does constitute part of a *conspiracy* to distribute drugs.") (emphasis in original); *United States v. Manning*, 462 F. App'x 345, 348 (4th Cir. 2012) (affirming § 924(c) and (j) convictions based on defendant's commission of "drug-related, retaliatory violence"); *United States v. Wiggins*, 968 F.2d 1213 (4th Cir. 1992) (Table) (affirming defendant's § 924(c) conviction where defendant fronted victim with cocaine that victim consumed rather than sold, and defendant shot victim for failing to repay the drug debt).

Additionally, other circuits have found that efforts to collect a drug debt constitute acts in furtherance of a drug conspiracy. *See, e.g.*, *United States v. Garcia-Hernandez*, 530 F.3d 657, 663 (8th Cir. 2008) ("A person's possession of a firearm furthers a drug distribution conspiracy crime when he uses it to frighten another person into paying a debt owed for a previous drug transaction."); *United States v. Santos*, 541 F.3d 63, 72 (2d Cir. 2008) ("Because narcotics conspiracies are illicit ventures, disputes are frequently settled by force or the threat of force. . . . Violence furthers such a [narcotics] conspiracy when used to collected debts directly . . . [or] by sending the message that those suspected of stealing from the conspiracy would be treated harshly.") (internal quotations omitted); *United States v. Markarian*, 967 F.2d 1098, 1104 (6th Cir. 1992) ("It is clear that under general conspiracy law the two trips to collect drug money were acts in furtherance of the conspiracy.")

The Court concludes the same. One of the clear purposes of the drug conspiracy here included the receipt of payment for the cocaine base distributed to Dudley, whether that payment

9

took the form of Percocets as originally anticipated or cash. Defendant only proceeded to Dudley's home, because Dudley still owed a debt to Defendant to complete the drug transaction first initiated earlier that morning. Thus, the arrival at Dudley's home and the violence that ensued constituted acts in furtherance of an ongoing drug conspiracy. For these reasons, Dudley's murder occurred in the course of the commission of Count Four and, therefore, constitutes a violation of § 924(j).

> B. **Sufficient Evidence Exists to Permit A Rational Juror to Determine That Defendant Shot Dudley or, Alternatively, Aided and Abetted in Dudley's Murder.**

Defendant's second argument asks the Court to discredit the testimony of informant George Holley and rely instead on Defendant's version of events. As noted, a challenge to the sufficiency of evidence presents a heavy burden, as the Court must consider the evidence presented at trial in a light most favorable to the Government and make all inferences and credibility determinations in its favor. *Hoyte*, 51 F.3d at 1245. In so doing, the Court must "assume that the jury resolved all contradictions in testimony in favor of the Government." *United States v. United Med. and Surgical Supply Corp.*, 989 F.2d 1390, 1402 (4th Cir. 1993); *see also United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997) ("[I]f the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe.") (internal quotations omitted). Indeed, the Court "will sustain the jury's verdict if *any* rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *United States v. Penniegraft*, 641 F.3d 566, 571 (4th Cir. 2011) (emphasis in original). Importantly, "[j]ust as the uncorroborated testimony of one witness or of an accomplice may be sufficient to sustain a conviction, the uncorroborated testimony of an informant may also be sufficient." *United States v. Wilson*, 115 F.3d 1185, 1190 (4th Cir. 1997).

Sufficient evidence exists in the record to permit a rational juror to find that Defendant murdered Dudley with a firearm. Holley provided testimony that Defendant admitted to murdering Dudley with a firearm, stating that Defendant told him on the afternoon of the murder "that was his work" and "to go down there and check the scene out." (Tr. at 370:13-14, 371:8.) Defendant also participated in a conversation after the murder that Holley overheard. According to Holley, Defendant "said out of his mouth that he pulled the gun out, shot that man so many times and then Dre shot him so many times." (Tr. at 380:19-21.)

Therefore, the jury could reasonably find on the basis of this testimony that Defendant shot Dudley. The Court declines to invade the province of the jury as to the issue of Holley's credibility and overturn the jury's decision to place a greater weight on Holley's testimony than Defendant's.

Moreover, sufficient evidence also exists to support the Government's alternate theory of liability — i.e., that Defendant aided and abetted in Dudley's murder and, therefore, shares liability as a principal. In Defendant's Reply, he contends that the Government cannot rely on an aiding and abetting theory of liability for Dudley's murder, because the Government has not proven that Defendant acted with the requisite intent, malice aforethought. (Def.'s Reply at 2-3.) However, based on the evidence presented during trial, the jury could have reasonably found that Defendant acted with the requisite intent.

As instructed to the jury, to find a defendant guilty of aiding and abetting the commission of a crime, the jury must find: (1) the defendant knew that the crime charged was to be committed or was being committed; (2) he knowingly did some act for the purpose of aiding, commanding, or encouraging the commission of that crime; and, (3) he acted with the intention of causing the crime charged to be committed. *See also United States v. Burgos*, 94 F.3d 849,

873 (4th Cir. 1996) (en banc) (internal quotations and citations omitted) ("A defendant is guilty of aiding and abetting if he has knowingly associated himself with and participated in the criminal venture. To prove association, the Government must establish that the defendant participated in the principal's criminal intent, which requires that a defendant be cognizant of the principal's criminal intent and the lawlessness of his activity."). Malice aforethought means either to kill another person deliberately and intentionally or to act with callous and wanton disregard for human life. *United States v. Williams*, 342 F.3d 350, 356 (4th Cir. 2003). To prove such intent, the Government only needed to show that Defendant acted with reckless and wanton disregard for a reasonable standard of care or proved otherwise aware that his actions posed a serious risk of death or serious bodily harm to Dudley. *Id.*

The Government presented evidence that Defendant led the expedition to Dudley's house and bore primarily responsibility for bringing the gun there. He did so with the purpose of claiming the drug debt that Dudley owed him. Admittedly, Defendant intended to inflict retaliatory physical injury on Dudley when they arrived. And, as conceded by Defendant, "the Government presented evidence that Archible knew or should have known that Ricks was violent and dangerous, and perhaps, reckless in his handling of firearms." (Def.'s Mot. at 14.) Additionally, a jury could have reasonably concluded that by handing the weapon to Ricks and looking at him, Defendant communicated his intent for Ricks to shoot Dudley. Defendant even suggested in his conversation with Agent Ambrose that he had ordered Ricks to kill Dudley for him. In fact, as Defendant stated during the October 2017 interview, Dudley's killing would not represent the first time that, as a five-star in the Bloods, Defendant ordered a lower-level gang member to carry out his work for him.

Based on these facts, the evidence supports the conclusion that Defendant acted with reckless and wanton disregard for a reasonable standard of care or remained otherwise aware that his actions posed a serious risk of bodily harm or death. *See United States v. Bran*, 776 F.3d 276, 280 (4th Cir. 2015) (evidence sufficient to support conclusion that defendant aided and abetted § 924(j) murder when defendant commanded others to murder the victim and provided the firearm to commit the murder); *Williams*, 342 F.3d at 356-57 (evidence "more than sufficient" for a jury to conclude that the defendant acted with malice aforethought when the defendant accompanied several co-conspirators to rob a known drug dealer, was ordered to shoot the dealer if he "acted up" and ultimately handed the gun to co-conspirator who delivered the shot that killed the victim). For these reasons, Defendant cannot carry the heavy burden that both Rule 29 and 33 require of him. Contrary to Defendant's assertions, sufficient evidence establishes Defendant's guilt. As a result, Defendant's convictions will stand.

## IV. CONCLUSION

For the reasons set forth above, the Court hereby DENIES Defendant's Motion for Judgment of Acquittal and/or a New Trial (ECF No. 134).

An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

/s/
David J. Novak
United States District Judge

Richmond, Virginia
Date: July 28, 2021